IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO: 3:02CV534

| | |
|---|---|
| JOHN E. WASHINGTON,<br>Plaintiff | )<br>)<br>) |
| vs. | )<br>)   **ORDER**<br>) |
| CITY OF CHARLOTTE,<br>Defendant. | )<br>)<br>)<br>) |

**THIS MATTER IS BEFORE THE COURT** on the "Motion for Summary Judgment" (Document No. 10) and corresponding "Defendant's Memorandum of Law in Support ..." (Document No. 11), filed July 30, 2004 by the City of Charlotte (the "City"); the "Plaintiff's Motion in Opposition ..." (Document No. 12) and corresponding "Plaintiff's Memorandum in Opposition ..." (Document No. 14), filed August 16, 2004 by John Washington; and the "Defendant's Reply in Support ..." (Document No. 12), filed August 27, 2004 by the City. The parties have consented to magistrate jurisdiction under 28 U.S.C. § 636(c), and this matter is now ripe for disposition.

Having carefully considered the arguments of the parties and the record, the undersigned will grant the "Motion for Summary Judgment" (Document No. 10).

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

In 1984, the City hired Mr. Washington as a temporary employee in the Sanitation Department of the City. Mr. Washington maintained the status of temporary employee for approximately five months. Mr. Washington then became a regular status employee, holding a

---

[1] The factual background is related in the light most favorable to Mr. Washington, the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

position as a shuttle driver in the Aviation Department of the City. At some subsequent time, Mr. Washington obtained the position of Labor Crew Chief I, a supervisory position responsible for the cleaning crew in the Field Maintenance section of the Aviation Department.

The employee handbook for the Aviation Department contains the following provision entitled "Use of City Vehicles, Equipment, Supplies & Property:"

> The use of City vehicles, equipment, supplies and property is for official City or Aviation Department work only and is strictly forbidden to be used for personal gain. The Aviation Department also has a published procedure for the disposal of surplus property contained in the Procedures Manual which prohibits employees from taking any City/Airport property *regardless of value*.

Mr. Washington acknowledged receiving the employee handbook on June 1, 1995.

While Mr. Washington held the position of Labor Crew Chief I, Donald Hicks, the Field Maintenance Manager, supervised Mr. Washington. Mr. Hicks is a black male. Each year, Mr. Hicks – as Mr. Washington's supervisor – completed a Performance Plan and Appraisal ("Performance Appraisal") for Mr. Washington. The rating categories on the Performance Appraisal are (i) "E," which stands for "Consistently Far Exceeds Requirements," (ii) "G," which stands for "Good Performance Which Meets and Periodically Exceeds Requirements," (iii) "M," which stands for "Meets Basic Requirements," and (iv) "NM," which stands for "Did Not Meet Basic Requirements." On the Performance Appraisals conducted from 1997 through 2000, Mr. Hicks assessed Mr. Washington's performance as "G." Mr. Hicks also supervised Mike Arnold, who held a supervisory position responsible for the landscaping crew in the Field Maintenance section of the Aviation Department.

According to Mr. Washington, Mr. Hicks – who, as mentioned above, is a black male himself – intended to "keep the black employees under control" while permitting "the white

employees ... to do whatever they wanted."  During employee meetings conducted by Mr. Hicks, Mr. Hicks would proclaim, "I am the head nigger in charge."  Mr. Washington believes that Mr. Hicks – despite being black – preferred white employees over black employees.  For example, Mr. Hicks strictly enforced a policy related to uniforms with respect black employees, while not enforcing the policy with respect to white employees.

In June 1996, Mr. Washington wrote a memorandum outlining the alleged disparate treatment given to black employees and white employees.  In January 1998, Mr. Washington submitted a written complaint about Mr. Arnold and Jeffrey Tucker.  At the time, Mr. Tucker was a member of the landscaping crew supervised by Mr. Arnold.  Mr. Washington did not supervise Mr. Tucker and had no power to discipline him.  No action was taken based on Mr. Washington's January 1998 written complaint.  According to Mr. Hicks, no employee other than Mr. Washington has complained about Mr. Tucker.

According to Shawn Jordan, who was an employee of the Aviation Department for a four year period of time, Mr. Arnold once wrote up Mr. Jordan for insubordination when Mr. Jordan refused to fill another employee's personal truck with mulch.  Mr. Jordan did not report the matter to Mr. Hicks.  Mr. Jordan also heard another employee brag that he was being paid by Mr. Arnold for doing Mr. Arnold's private landscaping work while the employee was "on the City time."  Mr. Jordan saw trees and shrubs delivered to the City but was unable to account for trees and shrubs that disappeared but did not appear to have been used by the City.[2]

---

[2] All information in the preceding paragraph was found only in the affidavit of Shawn Jordan, submitted by Mr. Washington in opposition to the Motion for Summary Judgment (the "Jordan Affidavit").  In the "Defendant's Reply in Support ...," the City moves this Court to strike the Jordan Affidavit, arguing that Mr. Jordan was not listed on Mr. Washington's disclosures pursuant to Rule 26 of the Federal Rules of Civil Procedures and that Mr. Jordan was

According to Luke Berry, who was also an employee of the Aviation Department for a four year period of time, Mr. Arnold was frequently permitted to drive to his house a truck owned by the City and that Mr. Arnold's crew members would fuel the truck for Mr. Arnold. Mr. Berry also states that Mr. Arnold had Mr. Berry perform work for Mr. Arnold's personal landscaping business "on the City time" and that he was told that Calvin Smith was hurt while working for Mr. Arnold's personal landscaping business. Mr. Berry does not state whether or not Mr. Hicks knew of these incidents. Mr. Berry contends that he was harassed by Mr. Tucker and that Mr. Tucker wanted Mr. Berry to "make troubles" for Mr. Washington.[3]

According to Biriam Thompson, who was a temporary employee in the Aviation Department

---

not identified in Mr. Washington's responses to discovery. The City also argues that the Jordan Affidavit gives no indication of when Mr. Jordan was employed by the City or whether any of the alleged events took place within the 180 days prior to the Charge. The undersigned does find it curious that a witness making such inflammatory accusations would not be deposed by either the City or Mr. Washington. Nonetheless, the undersigned does not have sworn statements from either the City or Mr. Washington's attorney regarding Mr. Washington's alleged failure to disclose the existence of Mr. Jordan. As such, the undersigned declines to rule on the City's motion to strike and will consider Mr. Jordan's statements solely for the purpose of deciding this Motion for Summary Judgment.

[3] All information in the preceding paragraph was found only in the affidavit of Luke Berry, submitted by Mr. Washington in opposition to the Motion for Summary Judgment (the "Berry Affidavit"). In the "Defendant's Reply in Support ...," the City moves this Court to strike the Berry Affidavit, arguing that Mr. Berry was not listed on Mr. Washington's disclosures pursuant to Rule 26 of the Federal Rules of Civil Procedures and that Mr. Berry was not identified in Mr. Washington's responses to discovery. Especially in light of the same disagreement between the parties with respect to the Jordan Affidavit, see supra n. 10, the undersigned finds it *more* than curious that a witness making such inflammatory accusations would not be deposed by either the City or Mr. Washington. Further, the undersigned is disappointed at the apparent lack of communication between counsel for the parties and the late stage at which such an issue has been presented. Nonetheless, the undersigned does not have sworn statements from either the City or Mr. Washington's attorney regarding Mr. Washington's alleged failure to disclose the existence of Mr. Berry. As such, the undersigned declines to rule on the City's motion to strike and will consider Mr. Berry's statements solely for the purpose of deciding this Motion for Summary Judgment.

under Mr. Washington's supervision in 2001, Mr. Arnold bullied other employees. Mr. Thompson also states that Mr. Hicks "covered up" an incident when Mr. Arnold threatened Mr. Washington and that Mr. Thompson was told that Calvin Smith was hurt while moving a tree from a truck owned by the City to Mr. Arnold's personal truck.[4]

Mr. Washington testified at his deposition that a white man named "Duke" had taken some brick pavers owned by the City, that Mr. Hicks had given Duke permission to do so, and that Mr. Hicks later gave Mr. Washington some brick pavers. Mr. Washington did not state the exact time at which this incident occurred, but said that it was not "that long" before he was terminated.

On April 23, 2001, Mr. Washington asked to speak to Mr. Tucker. Mr. Washington intended to ask Mr. Tucker to leave Mr. Washington alone. Mr. Tucker refused to speak to Mr. Washington and began to walk away. Mr. Washington said something to Mr. Tucker to the effect of, "From now on, if you have anything to say to me, do like the rest of the people and say it behind my back," and walked away. Mr. Tucker came up to Mr. Washington shortly thereafter and they began to argue.

Mr. Hicks was told that Mr. Washington and Jeffrey Tucker were arguing in the yard of the shop. Mr. Hicks observed that Mr. Washington was doing most of the talking. Mr. Hicks brought to his office Mr. Washington and Mr. Tucker. Mr. Hicks spoke to Mr. Washington and Mr. Tucker separately and asked them to explain the situation. Mr. Washington told Mr. Hicks something to the

---

[4] All information in the preceding paragraph was found only in the affidavit of Biriam Thompson, submitted by Mr. Washington in opposition to the Motion for Summary Judgment (the "Thompson Affidavit"). In the "Defendant's Reply in Support ...," the City moves this Court to strike the Thompson Affidavit for the same reasons it asked this Court to strike the Jordan Affidavit and the Berry Affidavit. For the reasons discussed <u>supra</u> n. 2 and n. 3, the undersigned declines to rule on the City's motion to strike and will consider Mr. Thompson's statements solely for the purpose of deciding this Motion for Summary Judgment. Because the City is a repeat litigant in this Court, the undersigned would be remiss if he did not ask the City to take <u>every reasonable precaution</u> in future cases to ensure that this issue does not arise again.

effect of, "Jeff has told on [me] taking stone from the shop yard." Mr. Tucker had not told Mr. Hicks that Mr. Washington had taken any stone.[5] Mr. Hicks excused Mr. Washington so that Mr. Washington could gather his cleaning crew for lunch. Mr. Hicks then contacted Ms. Boone.

On April 23, 2001, Babette Boone, the Human Resources Manager for the Aviation Department of the City, met with Mr. Washington and Mr. Hicks. Upon questioning by Ms. Boone, Mr. Washington admitted that, on April 21, 2001, he had taken without permission some ABC stone (the "Stone"), that he had taken the Stone to his house for use in a utility building, and that he had used a tractor owned by the City to put the Stone in his personal vehicle. It appears that the Stone was worth approximately fifteen dollars. At some point, Mr. Washington was asked, "As a supervisor, what would you tell or ask one of your employees, if it was reported that they took airport property for personal business?" Mr. Washington replied that he would ignore such behavior.

Mr. Hicks and George Robinette, who was Mr. Hicks' immediate supervisor, both recommended that Mr. Washington's employment be terminated. The following day, Jerry Orr, the Aviation Director, followed that advice and terminated Mr. Washington's employment with the City. In a memorandum dated April 24, 2001, Mr. Orr explained,

> It is my understanding that on Saturday, April 21, 2001, you used a City tractor to appropriate City property (ABC stone) for use at your private residence. ... Regardless of the monetary value of the City property, this action has been determined as willful, egregious and a violation of City policy .... Additionally, on Monday, April 23, your conduct towards a non-supervisory employee was unbefitting a supervisor and interpreted as intimidating and a misuse of authority. ...

---

[5] It appears from Mr. Washington's testimony that, on April 21, 2001, Mr. Tucker approached Mr. Washington shortly after Mr. Washington had taken certain ABC stone. Mr. Washington admitted to Mr. Tucker that Mr. Washington had taken the stone, and Mr. Tucker subsequently said something to Mr. Washington along the lines of, "You know you are stealing." Mr. Washington responded by saying something along the lines of, "[T]his ain't no more than what you and Mike Arnold are doing."

Mr. Orr considered both of those reasons for Mr. Washington's termination to be serious, and stated that the conduct towards Mr. Arnold "even by itself, [was] extremely serious, [and] absolutely unacceptable."

On May 7, 2001, Mr. Washington filed with the City a "Human Resources Department Complaint Form" (the "Complaint Form"). In the Complaint Form, Mr. Washington alleged, among other things, that "it is common practice for employees to take stones, pavers, or other supplies;" that Mr. Hicks would have permitted Mr. Washington to take the stones "if no one else was around;" that Mr. Washington, on his way home from work on April 21, 2001, passed Mr. Hicks on the access road, yet Mr. Hicks did not stop Mr. Washington; that Mr. Washington did not threaten Mr. Tucker during their argument; that Mr. Tucker is known for bullying other employees and getting away with it; that he was singled out because he is black; and that Mr. Arnold had misused property of the City without punishment. Mr. Washington also made a variety of allegations related to an injury suffered by Calvin Smith and reported as occurring in the performance of his job, payment for authorization of overtime, use of the pickup trucks owned by the City, and an assault by Paul Honeycutt of John Fayhe with a golf club. Mr. Washington asked that he be reinstated to his job "with discipline more in line with the violation," that disciplinary action be taken against white supervisors who were not disciplined for similar actions, and that he receive back pay.

At least in part because Mr. Washington filed the Complaint Form, Ms. Boone reviewed the information related to Mr. Washington's dismissal, investigated the allegations made by Mr. Washington in the Complaint Form, and prepared a written statement in response on behalf of the Aviation Department. With respect to a particular instance of the use of a pickup truck owned by the City and the assault with a golf club, the Aviation Department was unable to release information

7

from the personnel file of the concerned individuals. Based on the internal investigation conducted by Ms. Boone, the Aviation Department disputed all other allegations.

David Sanders and Teresa Curlin, both of whom are Analysts within the Human Resource Department of the City, also investigated the circumstances surrounding Mr. Washington's dismissal and the allegations made by Mr. Washington in the Complaint Form. Mr. Sanders and Ms. Curlin interviewed Mr. Washington, Ms. Boone, Kendrick Luckey, Mr. Tucker, Norman Hubert, Ken Yoder, Mr. Arnold, Wilbert Nichols, Mr. Hicks, Calvin Smith, Robert Mason, Tony Garrison, Sam Ford, Wallace Jordan and Mr. Orr.

On May 15, 2001, Mr. Washington filed a Charge of Discrimination (the "Charge") with the Equal Employment Opportunity Commission (the "EEOC"). In the Charge, Mr. Washington stated that his allegations of discrimination were based upon race. Mr. Washington alleged that he was discharged on April 24, 2001; that he was told that he was being discharged "for using city equipment to appropriate city property and because of conduct unbefitting a supervisor towards a non-supervisory employee;" and that, to the contrary, he was discharged because of his race. Mr. Washington listed the date that discrimination took place as April 21, 2001.

On May 30, 2001, Mr. Orr wrote Mr. Washington a letter explaining that Mr. Washington would not be reinstated and attaching as a "Response to Grievance by John Washington" the results of the investigation into the circumstances surrounding Mr. Washington's dismissal and the allegations made by Mr. Washington in the Complaint Form.

On January 24, 2002, Julie Burch, the Assistant Manager for the City, wrote Mr. Washington a letter in which she explained that she had reviewed "all pertinent documentation associated with [Mr. Washington's] dismissal and [his] contention that [he was] dismissed because [he is] a Black

male." Ms. Burch further explained that she found "no evidence that indicates there were improprieties in the dismissal process or that decisions were made based on race." Ms. Burch noted that she had not received any additional information to support Mr. Washington's allegations that he was treated unfairly. As such, Ms. Burch sustained Mr. Washington's termination.

In February 2002, an EEOC representative interviewed Mr. Hicks. Mr. Hicks told the representative that, other than the April 2001 instance with Mr. Washington, Mr. Hicks is unaware of any instance where an employee took property of the City without permission. Mr. Hicks also told the representative that Mr. Arnold had ordered trees and shrubs through the account of the City for Mr. Arnold's personal landscaping business; that Mr. Arnold ordered the trees and shrubs through the account of the City in order to get a discount; that, in an instance approximately two years ago, Mr. Hicks was aware that Mr. Arnold had the trees delivered to the airport; that Mr. Hicks did not give Mr. Arnold permission to order the trees and shrubs through the account of the City or to have them delivered to the airport; but that Mr. Arnold would show Mr. Hicks receipts evidencing Mr. Arnold's payment for the trees and shrubs ordered. Mr. Hicks denied any knowledge of some pavers being taken by Mr. Yoder, another employee. Mr. Hicks acknowledged that he had given Mr. Arnold permission to drive a truck owned by the City to Mr. Arnold's house on certain occasions, and explained that inclement weather and work requirements dictated who could take a truck home and when.

On September 20, 2002, the EEOC issued a Dismissal and Notice of Rights letter (the "Letter") to Mr. Washington. In the Letter, the EEOC informed Mr. Washington that it was "unable to conclude that the information obtained establishes violation of the statutes" and that, if he wished to file suit, he must do so within ninety days of his receipt of the Letter.

On December 23, 2002, Mr. Washington brought a Complaint against the City, alleging that the City discriminated against him in violation of Title VII of the Civil Rights Act of 1964, as amended, codified as 42 U.S.C. § 2000e et seq., on the basis of his race. Specifically, Mr. Washington complains of discrimination in the form of disparate treatment. He contends that he was discharged by the City "on the pretext that he had taken [the City's] property for personal use and had engaged in verbal disagreement with another employee, when white employees/supervisors who violated same or more egregious policies of [the City] were not terminated." Mr. Washington asks for relief in the form of compensatory and punitive damages, as well as reinstatement to the position, or a position substantially similar to the position, occupied by him prior to his termination.

By way of background, on July 25, 1995, Mr. Orr wrote a memorandum to Robert Allen, who was then the Chief Maintenance Mechanic. Mr. Orr explained that "[t]he City ... has confirmed your involvement in the theft of City-owned materials and abuse of a supervisory position." Specifically, Mr. Orr stated that Mr. Allen had taken grass seed, fertilizer and freon. As a result, Mr. Orr terminated Mr. Allen's employment effective July 26, 1995. Mr. Allen is a white male.

## II. STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure requires that summary judgment be granted if the pleadings, responses to discovery, and affidavits, if any, establish that "there is no genuine issue as to any material fact ...." Fed. R. Civ. P. 56(c). As this Court has previously explained,

> ... the moving party has the initial burden to show a lack of evidence to support [the non-moving party's] case. If this showing is made, the burden then shifts to the [non-moving party] who must convince the Court that a triable issue does exist.

Boggan v. Bellsouth Telecomm., Inc., 86 F. Supp. 2d 545, 547 (W.D. N.C. 2000) (citations omitted).

A genuine issue of material fact exists if a reasonable jury could return a verdict for the non-moving party on the evidence presented. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). The non-moving party opposing summary judgment cannot "rest upon ... mere allegation or denials ..., but ... must set forth specific facts showing that there is a genuine issue for trial." See id. at 248 (quoting First National Bank of Arizona v. Cities Service Co., 319 U.S. 253, 288-89 (1968)). Importantly, in deciding a motion for summary judgment, the court views the evidence presented in the light most favorable to the non-moving party – that is, "[t]he evidence of the non-movant is ... believed, and all justifiable inferences are ... drawn in his favor." See Anderson, 477 U.S. at 255.

### III. DISCUSSION

Title VII of the Civil Rights Act of 1964 as amended ("Title VII"), codified as 42 U.S.C. § 2000e et seq., makes it an unlawful employment practice for an employer

> to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a)(1). Title VII also prohibits discrimination by an employer against any individual because such individual "has opposed any practice made an unlawful employment practice" by Title VII or "participated in any manner in an investigation, proceeding, or hearing under" Title VII. 42 U.S.C. § 2000e-3(a).

In the Complaint, Mr. Washington complains of race discrimination in the form of disparate treatment. He contends that he was discharged by the City, allegedly for a violation of a policy of the City, but white employees, who violated the same or more egregious policies of the City, were

not terminated.

There are two means by which an employee can establish a violation of Title VII by disparate treatment. The first means is by

> demonstrating through direct or circumstantial evidence that ... discrimination motivated the employer's adverse employment decision. The employee, however, need not demonstrate that the prohibited characteristic was the sole motivating factor to prevail, so long as it was a motivating factor.

Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284 (4th Cir. 2004) (citing 42 U.S.C. § 2000e-2(m) and Price Waterhouse v. Hopkins, 490 U.S. 228, 241 (1989)). If the employee produces sufficient evidence for a reasonable jury to conclude that race or sex was a motivating factor, See Hill, 354 F.3d at 285,

> the burden of persuasion shifts to the employer to prove that it would have reached the same determination without any discriminatory animus. The determination of whether a plaintiff has satisfied this evidentiary threshold is a decision for the district court after it has reviewed the evidence, which ultimately hinges on the strength of the evidence establishing discrimination.

Taylor v. Virginia Union Univ., 193 F.3d 219, 232 (4th Cir. 1999) (internal marks and citations omitted), abrogation on other grounds recognized by, Hill, 354 F.3d at 284-85. If the employer is able to show that it would have reached the same decision absent the discriminatory animus, the plaintiff is limited in his available remedies. See Taylor, 193 F.3d at 232; Hill, 354 F.3d at 284.

In the absence of such evidence, the employee must proceed under the analytical framework first enunciated by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). As the Fourth Circuit has concisely explained the McDonnell Douglas framework,

> the plaintiff-employee must first prove a *prima facie* case of discrimination by a preponderance of the evidence. If [he] succeeds, the defendant-employer has an opportunity to present a legitimate, non-discriminatory reason for its employment action. If the employer does so, the presumption of unlawful discrimination created

by the *prima facie* case drops out of the picture and the burden shifts back to the employee to show that the given reason was just a pretext for discrimination. The plaintiff always bears the ultimate burden of proving that the employer intentionally discriminated against [him.]

Evans v. Tech. App. & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1999) (internal marks and citations omitted).

Because the plaintiff always "bears the ultimate burden," a defendant employer may be entitled to summary judgment *even if* the plaintiff has established a prima facie case and shown that the explanation proffered by his employer is pretextual. See Rowe v. Marley Co., 233 F.3d 825, 830 (4th Cir. 2000).

> Even when a plaintiff demonstrates a prima facie case and pretext, his claim should not be submitted to a jury if there is evidence that precludes a finding of discrimination, that is if no rational factfinder could conclude that the action was discriminatory. But absent such evidence, courts may not require a plaintiff who proves both a prima facie case and pretext to produce additional proof of discrimination in order to survive a defendant's motion for summary judgment. This is so because it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation.

Id. (internal marks and citations omitted).

Importantly, regardless whether a plaintiff-employee brings direct or circumstantial evidence or proceeds under the McDonnell Douglas framework, the real issue

> in every employment discrimination case is whether the plaintiff was the victim of intentional discrimination. To demonstrate such an intent to discriminate on the part of the employer, an individual alleging disparate treatment based upon a protected trait must produce sufficient evidence upon which one could find that the protected trait actually motivated the employer's decision. The protected trait must have actually played a role in the employer's decision making process and had a determinative influence on the outcome.

Hill, 354 F.3d at 286 (internal marks and citations omitted) (quoting in part Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 141 (2000)).

13

Mr. Washington has not presented either direct or indirect evidence that race was a motivating factor in the contested employment decision, much less that it had a determinative influence on the outcome. See Hill, 354 F.3d at 284. Instead, Mr. Washington has chosen to proceed under the McDonnell Douglas framework.

The specific elements making up a prima facie case of discrimination vary depending on the particular claim brought by the plaintiff-employee. McDonnell Douglas Corp., 411 U.S. at 802 n. 13. In order to establish a prima facie case of discrimination based on disparate discipline, a plaintiff must prove that he is (1) a member of a protected group; (2) "engaged in prohibited conduct similar to that of a person of another race, color, sex, religion or national origin[;]" and (3) "that disciplinary measures enforced against the plaintiff were more severe than those enforced against the other person." Moore v. City of Charlotte, 754 F.2d 1100, 1105-06 (4th Cir. 1985). Adapting those elements more particularly to a claim of disparate discipline involving termination, a plaintiff must prove that he is (1) a member of a protected group; (2) "that he was qualified for his job and his performance was satisfactory; (3) he was terminated; and (4) other employees who were not members of the protected [group] were retained under apparently similar circumstances." Byrd v. Baltimore Sun Co., 279 F. Supp. 2d 662, 668 (D. Md. 2003) (citation omitted); see also Brewer v. Dana Corp., 205 F. Supp. 2d 511, 519 (W.D. N.C. 2002).

It is undisputed that Mr. Washington is a member of a protected group, that he was qualified for his job, that his performance – excepting the events of April 21, 2001 – was satisfactory, and that he was terminated. Indeed, on performance reviews performed by Mr. Hicks between 1997 and 2000, Mr. Washington consistently received a "G" rating, indicating that he had met, and occasionally exceeded, the requirements of his position. As such, the City argues only with respect

to the fourth element of the prima facie case – that is, the City argues that Mr. Washington has not produced sufficient evidence to support that other employees who were not members of the protected group were retained under similar circumstances. Mr. Washington, on the other hand, points to what he alleges are similar circumstances underlying the City's retention of Mr. Arnold.[6]

---

[6] Mr. Washington, in his brief, does not allege that any employee – other than Mr. Arnold – received disparate treatment – that is, was retained – under similar circumstances. To the extent that there are other instances in the record with respect to which Mr. Washington could possibly argue disparate treatment, the Court concludes that those other instances either do not involve similar circumstances for Title VII purposes or are not supported by sufficient evidence. See Wall v. City of Durham, 169 F. Supp. 2d 466, 476 (M.D. N.C. 2001) (finding an incident dissimilar where the statement in affidavit was "unsupported and unexplained" and there was "insufficient evidence to allow a trier of fact to compare the incidents and conclude that they are similar").

The various allegations made by Mr. Thompson, Mr. Jordan and Mr. Berry as well as Mr. Washington's allegations in the Complaint Form – specifically, the allegations regarding an injury suffered by Calvin Smith and reported as occurring in the performance of his job, payment for authorization of overtime, use of the pickup trucks owned by the City, an assault by Paul Honeycutt of John Fayhe with a golf club, and the performance of work for Mr. Arnold's personal landscaping business on City time – involve the falsification of information, bribery, and violence. Those allegations do not involve the permanent taking of City supplies for personal use and, even though "exact equivalence is not required," see id. at 474, cannot be considered comparable for Title VII purposes. Importantly, with respect to most of those allegations, there is no information in the record to show that the decision makers knew of those incidents. Mr. Hicks, Mr. Robinette and Mr. Orr cannot be faulted for failing to act on information that they did not have. See id. at 477 (finding irrelevant to the analysis "an incident that upper level management was never informed occurred").

Mr. Washington's allegations in his deposition regarding pavers taken by a white male named "Duke" are entirely unsupported. Mr. Washington was unable to provide a full given name for "Duke," and the Court can only suppose that "Duke" may be Mr. Yoder. Other than Mr. Washington's deposition, no other evidence in the record provides support for any such incident. See id. at 476. Mr. Hicks explicitly stated that he was unaware of any misappropriation of City property other than the misappropriation by Mr. Washington in April 2001.

The allegations by Mr. Jordan that he was disciplined by Mr. Arnold when he failed to fill another employee's personal truck with mulch are also unsupported by any evidence in the record. There is an equally plausible innocent explanation for that event – for example, that the other employee was using his personal truck to perform work for the City – and Mr. Jordan has not provided enough information for the Court to conclude otherwise. Furthermore, Mr. Jordan admits that he did not report this incident to Mr. Hicks, meaning – of course – that Mr. Hicks and Mr. Hicks' superiors had no information upon which they could discipline or terminate Mr.

15

Being mindful that "[t]he burden of establishing a prima facie case of disparate treatment is not onerous," Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981), and taking the facts in the light most favorable to Mr. Washington, this Court still must agree with the City on this point. Mr. Washington has not refuted the evidence presented by the City that Mr. Arnold showed Mr. Hicks sales receipts evidencing Mr. Arnold's payment for purchases made by Mr. Arnold. Indeed, the events recounted by Mr. Jordan and Mr. Washington are entirely consistent with a purchase by Mr. Arnold made through the City account but paid for by Mr. Arnold. Whether or not Mr. Arnold had permission to make such purchases, from the evidence presented, it is impossible to conclude that Mr. Arnold misappropriated City property.

Furthermore, even if the Court were to assume that Mr. Arnold misappropriated City property, there is no evidence in the record to show that the decision makers here knew of such misappropriation. As far as the Court knows, Mr. Hicks and Mr. Robinette, who recommended Mr. Washington's termination, and Mr. Orr, who terminated Mr. Washington, had no knowledge of any misappropriation by Mr. Arnold. As such, the Court cannot fault Mr. Hicks, Mr. Robinette and Mr. Orr for failing to take action on information that they did not have. See Wall v. City of Durham, 169 F. Supp. 2d 466, 477 (M.D. N.C. 2001). To the knowledge of Mr. Washington's supervisors, Mr. Washington was the only individual who misappropriated City property. Indeed, Mr. Washington admitted misappropriating City property and, at some point during the investigation, stated that he would ignore similar behavior by his subordinates. With this information, and also considering what was reported as intimidating conduct by Mr. Washington towards a non-supervisory employee, Mr. Orr took what he believed to be appropriate action. Moreover, albeit temporally distant from

---

Arnold. See id.

April 2001 termination of Mr. Washington, in the instance most similar to Mr. Washington's – the July 1995 termination of Mr. Allen for misappropriation of City property – the City took the same action with respect to a white male as it did with respect to Mr. Washington. As such, for the foregoing reasons, the Court concludes that Mr. Washington did not establish that other employees who were not members of a protected class were retained under similar circumstances and that Mr. Washington failed to establish a prima facie case of disparate treatment.

Even assuming that Mr. Washington had established a prima facie case of disparate treatment, the City articulated a legitimate, nondiscriminatory reason for its decision to terminate Mr. Washington: Mr. Washington misappropriated City property and exhibited intimidating conduct towards a non-supervisory employee. As such, the burden is back on Mr. Washington to show that the City's proffered reason is merely a pretext for discrimination. Unfortunately for Mr. Washington, he cannot establish pretext on the part of the City.

As discussed above, Mr. Washington admitted to Mr. Hicks and Ms. Boone that he had misappropriated City property and further stated that he would ignore similar behavior by other employees. Misappropriation of City property, regardless of value, is undisputedly a violation of City policy. Also, Mr. Hicks witnessed at least some of the altercation between Mr. Washington and Mr. Tucker and reported that Mr. Washington was doing most of the talking. No employee other than Mr. Washington had ever complained to Mr. Hicks about Mr. Tucker's behavior. Based on what Mr. Hicks observed and what Mr. Washington told Mr. Hicks, Mr. Hicks – a black male – reported the incident to Ms. Boone. Mr. Hicks and Mr. Robinette subsequently recommended that Mr. Washington be terminated. Mr. Orr – acting on the information he had been given by Mr. Washington's supervisors and without knowledge of any similar behavior by other employees –

terminated Mr. Washington. Because Mr. Washington cannot show that the City's proffered reason is a pretext for discrimination, Mr. Washington is not entitled to submit his case to a jury.

In summary, because Mr. Washington did not establish that other employees who were not members of a protected class were retained under similar circumstances, and because Mr. Washington cannot show that the City's proffered reason for his termination was a pretext for discrimination, the City is entitled to summary judgment on Mr. Washington's claim of discrimination.

### IV.  CONCLUSION

**IT IS, THEREFORE, ORDERED** that the "Motion for Summary Judgment" (Document No. 10) is **GRANTED**.

**Signed: June 14, 2005**

David C. Keesler
United States Magistrate Judge